# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

MABROUK CHAARA,

      Plaintiff,

vs.                                                                      No. CIV-05-278 JB/RLP

INTEL CORPORATION, DAVID
BAGLEE, BRIAN RASHAP, and
TAMMY WASH,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Motion for Summary Judgment, filed August 1, 2005 (Doc. 24).  The Court held a hearing on this motion on October 14, 2005.  The primary issue is whether Defendants Intel Corporation, David Baglee, Brian Rashap, and Tammy Wash have demonstrated that there is no genuine issue that they based their actions on legitimate non-discriminatory reasons, that there is not a causal connection between Chaara's protected activity and alleged retaliation, that Chaara's employment was at-will, and that comments placed in his performance review were opinion.  Because the Court finds that the Defendants have shown that there is no genuine issue of material fact for any of Chaara's claims and that the Defendants are entitled to judgment as a matter of law, the Court will grant in part the Defendants' Motion for Summary Judgment.

**FACTUAL BACKGROUND** [1]

Chaara, who is of Arab descent and was born in Tunisia, began working for Intel in May 1996 as a Grade 7 Engineer.  See Affidavit of Mabrouk Chaara ¶¶ 1-2, at 1 (executed August 17, 2005)(hereinafter "Chaara Aff."). On September 5, 2001, Chaara filed a charge of discrimination with the Equal Employment Opportunity Commission. See id. ¶ 4, at 1.  A week later, Chaara filed another charge, alleging retaliation for filing the earlier charge.  See id. ¶ 5, at 1.  Eventually, Chaara decided not to file suit on either of these two charges.  See id. ¶ 7, at 2.

Chaara applied to be a "group leader" ("GL") in the fall of 2002.  Deposition of Mabrouk Chaara at 80:3-6 (taken July 20, 2005)(hereinafter "Chaara Depo."); E-mail from Mabrouk Chaara to Brian A. Rashap at 1 (dated September 24, 2002).  The GL position transitions Intel employees onto a management career track; "[m]anagement skills and the ability to communicate and work well with others are important qualifications for the position."  Affidavit of Brian Rashap ¶ 2, at 1 (executed July 28, 2005)(hereinafter "Rashap Aff.").  Rashap, the hiring manager, selected Chaara as one of "seven or eight" finalists for an interview for the GL position.  Id. ¶ 3, at 1.

The panel making the decision consisted of six people: three "individual contributors" ("ICs") who were peers of the finalists or would work under the newly hired GL, and three current GLs.  Id. ¶ 4, at 1.  The ICs and GLs separately interviewed the candidates.  See id.  The Defendants represent that steps were taken to ensure that no single panel member had a disproportionately strong voice

---

[1] In crafting its factual background, the Court has relied on the parties' recitation of the facts and the citations they have provided to support those facts.  In many instances, Chaara's brief cites generally to the exhibits that he has attached to his motion, without providing a cite for particular pages or paragraphs of those exhibits, making it difficult to determine the precise passages that Chaara wishes to cite.  Where possible, the Court has provided cites to particular pages or paragraphs of those exhibits in its factual background.

in the recommendations and that all applicants were given the same amount of interview time and were asked the same questions, see id.; Chaara states that there is no evidence to support these assertions, see Response and Memorandum in Support of Plaintiff's Response to Defendants' Motion for Summary [sic] ("Response") at 3, filed August 18, 2005 (Doc. 30).

Four of the six panel members recommended that Chaara not be promoted to a GL position, and three panelists made "strong not hire" recommendations.  Rashap Aff. ¶ 6, at 2.  The three panelists who registered a "strong not hire" recommendation were Tom Owen, Bill Wilson, and Mike Viera, the three GLs on the panel whose immediate superior was Rashap.  Chaara Aff. ¶ 16, at 3; Mike Viera Interview Rating Sheet at 1; Bill Wilson Interview Rating Sheet at 1; Tom Owen Interview Rating Sheet at 1.  One panelist stated that Chaara had "no people skills," and another described him as "self-centered" who believes his "personal opinion outweighs group decisions." Panel Notes on Mabrouk Chaara at 1.  Chaara does not challenge that Rashap, who attended a "wrap-up" in which each panel member presented his or her recommendations on each finalist, including Chaara, gave his views only after every other panelist had said his peace, but contends that there is a question of fact whether anything was said after Rashap spoke and before the final decision on the promotion.  See Response at 4.

After considering the panel's input, Rashap hired Stacy Stone, who had three and a half years of management experience, for the vacant GL position to which Chaara had applied, see Rashap Aff. ¶ 7, at 2; Chaara states that the Defendants have not provided evidence of Stone's managerial experience, and that he also had experience in managing employees because he had supervised other engineers in the past, see Response at 5. All six panelists recommended Stone for the GL slot, with two giving her "strong hire" recommendations.  Rashap Aff. ¶ 7, at 2.  Chaara had more technical

experience in his area of expertise than Stone did.  See Chaara Aff. ¶ 24, at 5.  Chaara asserts that Intel would hire female employees to meet quotas even if there was a higher qualified male applicant.  See id. ¶ 25, at 5.

Afterward, Rashap met with Chaara to discuss the panel's comments concerning Chaara, including his "inadequate" people skills, his belief that his personal opinions outweighed group discussions, and that his inability to see "the big picture."  Rashap Aff. ¶ 9, at 3.  Chaara rejected Rashap's comments and refused to accept them as areas for improvement because he believed they were part of a "cover up."  Chaara Depo. at 192:6-19.

In January 2003, six GLs ranked and rated various employees, including Chaara, as part of a review of their performance in 2002.  See Affidavit of Spider Fehrman ¶ 3, at 1 (executed July 29, 2005)(hereinafter "Fehrman Aff.").   Initially, each GL ranked the employees, based on each employee's self evaluation in a "bragsheet," and then the GLs met as a group to discuss the employees.  Id. ¶ 4, at 1.  At the meeting, the GLs placed individuals into "clouds" of people who performed at a similar level.  Id. ¶ 5, at 1.  The GL group unanimously placed Mark Eaton into the top cloud by himself.  See id.  On two occasions, Chaara had been asked to assist Eaton on matters that Eaton allegedly could not solve on his own.  See Chaara Depo. at 218:2-11.  The group ranked Chaara second overall and the first person in the second cloud, the first cloud below the top cloud.  See Fehrman Aff. ¶ 6, at 2.  The group gave Chaara "B" level Intel stock, and Chaara later received the more desirable "C" level stock.   Affidavit of David Baglee ¶ 6, at 1 (executed July 27, 2005)(hereinafter "Baglee Aff.").  Baglee asserts that it was his recommendation that Chaara receive the higher level of stock, although Intel's Human Resources Department identified Spider Fehrman, one of Chaara's two immediate supervisors, as the one who made this recommendation.  See Letter

from Christine Frutschy, Human Resources Legal Investigator, to Richard Edwards, Civil Rights Specialist/Investigator, at 4 (signed June 30, 2003).

Baglee, the Plant Manager, Rashap, and Wash, the Fab 11 Litho-Etch Processing Engineer Manager, were not on the GL panel.  See Fehrman Aff. ¶ 3, at 1.  Wash and Rashap, however, attended the session.  See Letter from Christine Frutschy, Human Resources Legal Investigator, to Richard Edwards, Civil Rights Specialist/Investigator, at 4.

Chaara asserts that Fehrman and Murali Denduluri, Chaara's two immediate supervisors, told him, before the meeting, that he was ready for a promotion and they were going to get him a promotion.  See Chaara Depo. at 262:6-10.  Once the meeting finished, Fehrman and Denduluri gave him "positive feedback" about the process, and Denduluri gave Chaara a "thumbs-up."  Fehrman Aff. ¶ 8, at 2; Affidavit of Murali Denduluri ¶ 9, at 2 (executed July 29, 2005)(hereinafter "Denduluri Aff.");  Chaara Depo. at 262:16-18.  Chaara asserts that Fehrman told him that he had gotten the promotion and that it was taken away by Baglee and Rashap, see Chara Depo. at 262:25-263:15, but the Defendants maintain that the record supports only that Fehrman told Chaara that his promotion "went upstairs for approval" and that Chaara interpreted this comment to mean that Rashap was going to take it to Baglee for approval, Defendants' Reply Brief in Support of Summary Judgment ("Reply") at 2, filed October 7, 2005 (Doc. 45).  After Fehrman and Denduluri reviewed the performance of the other employees, they determined that it would be inappropriate to recommend Chaara for promotion.  See Fehrman Aff. ¶ 7, at 2; Denduluri Aff. ¶ 8, at 2.  Fehrman and Denduluri agreed with the decision to place Eaton in the top cloud by himself.  See Fehrman Aff. ¶ 5, at 2; Denduluri Aff. ¶ 6, at 2.  Fehrman and Denduluri never recommended Chaara's promotion.  See Fehrman Aff. ¶ 7, at 2; Denduluri Aff. ¶ 8, at 2.

Upon completion of the ranking-and-rating meeting, Wash recommended additions to the reviews of several employees, including a section in Chaara's Performance Review suggesting that he improve his communication skills.  See Affidavit of Tammy Wash ¶¶ 1, 9, at 1-2 (executed July 29, 2005)(hereinafter "Wash Aff."); Chaara Aff. ¶ 35, at 7.  The new section stated:

> Mabrouk should continue to enhance his communication effectiveness.  Mabrouk needs to be able to modify his communication style based on the situation. . . .  His presentations need to be tailored to the audience level, expected outcome, and time constraint.  Polishing his skills in communication will engage the audience while they are listening and make them receptive about his recommendations.

Performance Review at 2.  Fehrman and Denduluri agreed with Wash's suggestion.  See Fehrman Aff. ¶ 11, at 3; Denduluri Aff. ¶ 12, at 3. Chaara's written review, in which he was rated "successful," included the entirety of his bragsheet and the new section on his communication skills.  Fehrman Aff. ¶ 12, at 3; Denduluri Aff. ¶ 13, at 3.  Intel managers are not prohibited from adding new areas of development or making other changes to an employee's review.  See Wash Aff. ¶ 11, at 3.  The employee's bragsheet does not automatically become his performance review, and Intel does not allow an employee to write the entirety of his own review.  See id.  Chaara asserts that it has never been Intel's policy or procedure to supplement a final review following a ranking-and-rating session.  See Response at 10.

On April 25, 2003, Wash met with Chaara to discuss the Performance Review.  See Wash Aff. ¶ 12, at 3.  Chaara told Wash that he thought the process was unfair, and that Baglee and/or Rashap were responsible for him not being promoted and for the item added to his Performance Review.  See id.  Wash told Chaara that she had recommended adding the item to his Performance Review.  See id. ¶ 13, at 3-4.

Baglee told Chaara that he supported Wash's decision to include the new section.  See

Baglee Aff. ¶ 10, at 2.  Baglee also informed Chaara that it is the direct manager who is responsible for the content of an employee's review, and the manager was not obligated to include only what was contained in the employee's bragsheet.  See id.

Subsequently, Chaara used Intel's "Open Door" process.  Affidavit of Eileen Boudreau ¶ 2, at 1 (executed July 29, 2005)(hereinafter "Boudreau Aff.").  Chaara requested that the Open Door process be limited to whether Baglee or Rashap was responsible for Chaara not being selected as a GL and whether they caused the communication item to be added to his review.  See id. ¶ 2, at 1. Chaara told Open Door investigator Eileen Boudreau that, if Fehrman and Denduluri agreed with the decision not to promote him, then the investigation should end.  See id. ¶ 4, at 2.  When Boudreau asked Chaara if Fehrman would be honest, Chaara said that he would "put every dime on Spider [Fehrman]."  Id.  Fehrman and Denduluri told Boudreau that neither Baglee nor Rashap influenced their decision not to recommend Chaara for promotion.  See id. ¶¶ 3, 5, at 1-2; Fehrman Aff. ¶ 14, at 3; Denduluri Aff. ¶ 15, at 3.  When Boudreau followed up with Chaara, Chaara told her that he had proof of his accusations but would not provide it to Boudreau.  See Boudreau Aff. ¶ 10, at 3.  Chaara did not provide Boudreau with any further information.  See id.  Boudreau did not interview Baglee or Rashap.  See Chaara Aff. ¶ 51, at 9.

Upon completing her investigation, Boudreau concluded that Chaara's allegations against Baglee and Rashap were unsubstantiated.  See Boudreau Aff. ¶ 11, at 3.  Boudreau told Chaara she would re-open the investigation if Chaara shared his evidence, but Chaara did not do so.  See id. ¶ 10, at 3.  If Boudreau had discovered evidence of wrongdoing, she could have reversed the decision not to promote Chaara.  See id. ¶ 11, at 3.  Boudreau also told Chaara that a Performance Review may be different from a bragsheet.  See id. ¶ 7, at 3.  Boudreau reminded Chaara that a bragsheet is

prepared by the employee and reviewed with managers before the ranking-and-rating session; Boudreau further told Chaara that the performance review is management's assessment of the employee's performance that, in many cases, is different from the bragsheet.  See id. ¶ 10, at 3.

## PROCEDURAL BACKGROUND

On April 21, 2003, Chaara filed a Charge of Discrimination against the Defendants with the New Mexico Human Rights Division ("NMHRD"), alleging discrimination based on national origin, religion, and gender, and retaliation.  See Memorandum Opinion and Order at 4, filed December 31, 2005 (Doc. 48).  While finding probable cause on his national origin discrimination and retaliation claims, the NMHRD issued an Order of Non-Determination on Chaara's religion and gender claims. See id.  On April 16, 2004, Chaara filed a Complaint in the Thirteenth Judicial District Court for New Mexico in Chaara v. Intel Corporation,  No. D-1329-CV-04-00376 (Dist. Ct. N.M.)("Chaara I"). See id.  The Chaara I Complaint sought relief on Chaara's gender claim, at the same time as he pursued his national origin discrimination and retaliation claims with the New Mexico Human Rights Commission.  See id. at 5.  Chaara I also set forth claims for breach of an employment contract, breach of the covenant of good faith and fair dealing, and defamation.  See id.  In response, the Defendants removed Chaara I to the United States District Court for the District of New Mexico on the basis of diversity of citizenship between the parties.  See id.  The Defendants asserted that Chaara is a citizen of Colorado, Intel is a Delaware corporation with its principal place of business in California, and the other Defendants are citizens of New Mexico.  See id.

The Honorable Bruce Black, United States District Judge, who presided over Chaara I during its brief life in federal court, scheduled, sua sponte, an evidentiary hearing to determine the existence of complete diversity.  See id.  Following the hearing, held on June 23 and July 29, 2004, Judge Black

remanded Chaara I back to New Mexico State District Court, based on his finding that Chaara was domiciled in New Mexico when he filed the Chaara I Complaint.  See id.

Subsequently, the New Mexico Human Rights Commission determined that Chaara had failed to establish his national origin discrimination and retaliation claims, leading him to file a second complaint in the Thirteenth Judicial District Court for New Mexico, thereby initiating Chaara v. Intel Corporation,  No. D-1329-CV-05-00154 (Dist. Ct. N.M.)("Chaara II"), on February 10, 2005.  See id.  In addition to alleging national origin discrimination and retaliation, Chaara II also set forth claims for breach of an employment contract, breach of the covenant of good faith and fair dealing, and defamation.  See id. at 6.  The Defendants in Chaara II are the same as those listed in Chaara I.  See id.

The parties in both cases stipulated to a consolidation of both actions in state court.  See id. The New Mexico State District Court found that the two cases "involve common questions of both law and fact" and consolidated the actions, pursuant to rule 1-042(A) of the New Mexico Rules of Civil Procedure, "for any and all purposes."  Id.  The Stipulated Order of Consolidation explained that both cases would be captioned "Mabrouk Chaara, Plaintiff, vs. Intel Corporation, David Baglee, Brian Rashap, and Tammy Wash: No. D-1329-CV-04-00376 and No. D-1329-CV-05-00154."  Id.

On March 14, 2005, the Defendants removed the consolidated action to this District on the basis of diversity of citizenship.  See id.  Once again, the Defendants alleged that Chaara is a citizen of Colorado, and that none of the Defendants are citizens of that state.  See id.

Chaara filed a Response to Defendants' Notice of Removal and Motion for Remand ("Motion to Remand") on April 11, 2005 that objected to the removal of the consolidated cases.  See id.  On December 31, 2005, the Court granted in part and denied in part Chaara's motion to remand.  See

id. at 1.  The Court remanded to state court the claims from <u>Chaara I</u> for gender discrimination,

breach of an employment contract, breach of the covenant of good faith and fair dealing, and

defamation, because 28 U.S.C. § 1447(d) barred review of Judge Black's order remanding those

claims, and the consolidation of <u>Chaara I</u> and <u>II</u> did not destroy each suit's separate identity.  <u>See</u> <u>id.</u>

at 19.  The Court did not remand <u>Chaara II</u>'s claims, for national origin discrimination, retaliation,

breach of an employment contract, breach of the covenant of good faith and fair dealing, and

defamation, because diversity of citizenship existed when <u>Chaara II</u> was filed.  <u>See</u> <u>id.</u>

 Before the Court ruled on Chaara's motion to remand, the Defendants filed a motion for

summary judgment on all claims, contending that there is no genuine issue of material fact on those

claims.  <u>See</u> Motion for Summary Judgment at 1.  Chaara filed a response detailing the genuine issues

that he believes exist.  <u>See</u> <u>generally</u> Response, filed August 18, 2005 (Doc. 30).  The Court held a

hearing on the motion on October 14, 2005.

## <u>STANDARDS FOR DETERMINING MOTIONS FOR SUMMARY JUDGMENT</u>

 Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ.

P. 56(c).  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  The opposing party may not rest

upon mere allegations and denials in the pleadings, but must set forth specific facts showing that there

is a genuine issue for trial.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)(citing

Fed. R. Civ. P. 56(e)).  An issue of fact is "genuine" if the evidence is significantly probative or more

than merely colorable such that a jury could reasonably return a verdict for the non-moving party.

<u>Id.</u> at 249-50 (citations omitted).  Mere assertions or conjecture as to factual disputes are not enough

to survive summary judgment.  See Branson v. Price River Coal Co., 853 F.2d 768, 771-72 (10th Cir. 1988).  The Court may only consider admissible evidence when ruling on a motion for summary judgment.  See World of Sleep, Inc. v. La-Z-Boy Chair, Co., 756 F.2d 1467, 1474 (10th Cir. 1985)(citing Fed. R. Civ. P. 56(e)).

If a defendant seeks summary judgment, it has an "initial burden to show that there is an absence of evidence to support the nonmoving party's case." Munoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1164 (10th Cir. 2000)(quoting Thomas v. IBM, 48 F.3d 478, 484 (10th Cir. 1995))(internal quotations omitted).  Upon meeting that burden, the plaintiff must "identify specific facts that show the existence of a genuine issue of material fact." Id. (citations and internal quotations omitted).  "The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor." Id. (citations and internal quotations omitted).  The non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. at 324 (internal quotations omitted).

## LAW REGARDING THE NEW MEXICO HUMAN RIGHTS ACT

### 1.    National Origin Discrimination

The New Mexico Human Rights Act ("NMHRA") forbids

an employer, unless based on a bona fide occupational qualification or other statutory prohibition, to refuse to hire, to discharge, to promote or demote or to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of race, age, religion, color, national origin, ancestry, sex, physical or mental handicap or serious medical condition. . . .

N.M. Stat. Ann. § 28-1-7(A).  The Supreme Court of New Mexico considers "helpful" the burden-

shifting framework that the Supreme Court of the United States established in <u>McDonnell Douglas</u>

<u>Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>See</u> <u>Juneau v. Intel Corp.</u>, 139 N.M. 12, 127 P.3d 548, 551

(2005).  Under that analysis, "an employee bears the initial burden of demonstrating a prima facie case

of discrimination, which then shifts the burden to the employer to provide a legitimate,

non-discriminatory reason for the adverse employment action."  <u>Id.</u> (citation omitted).  In a failure

to promote case, both the New Mexico Court of Appeals and the United States Court of Appeals for

the Tenth Circuit have defined the prima facie case: "In such a case, a plaintiff must show (1) that [he]

was a member of a protected class, (2) that [he] was qualified for the position, (3) that [he] was

rejected, and (4) that the position was filled by someone who was not a member of the protected

class."  <u>Silverman v. Progressive Broad., Inc.</u>, 125 N.M. 500, 505, 964 P.2d 61, 66 (Ct. App.

1998)(citations omitted); <u>Kenworthy v. Conoco, Inc.</u>, 979 F.2d 1462, 1469 (10th Cir. 1992)(citing

<u>Luna v. City & County of Denver</u>, 948 F.2d 1144, 1147 (10th Cir. 1991)).  If the defendant puts forth

a legitimate non-discriminatory reason, the burden shifts back to the plaintiff to "present[] evidence

that the defendant's proffered reason for the employment decision was pretextual -- i.e. unworthy of

belief."  <u>Kendrick v. Penske Transp. Servs., Inc.</u>, 220 F.3d 1220, 1230 (10th Cir. 2000)(citations

omitted).[2]

     "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies,

or contradictions in the employer's proffered legitimate reasons for its action that a reasonable

factfinder could rationally find them unworthy of credence and hence infer that the employer did not

---

[2] The Supreme Court of New Mexico has stated that, "when considering claims under the NMHRA, we may look at federal civil rights adjudication for guidance in interpreting the NMHRA. Our reliance on the methodology developed in the federal courts, however, should not be interpreted as an indication that we have adopted federal law as our own." <u>Ocana v. Am. Furniture Co.</u>, 135 N.M. 539, 549, 91 P.3d 58, 68 (2004)(citations and internal quotations omitted).

act for the asserted non-discriminatory reasons." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th

Cir. 1997)(internal quotations omitted)(citations omitted). "To avoid summary judgment, a party

must produce *specific* facts showing that there remains a genuine issue for trial and evidence

significantly probative as to any [material] fact claimed to be disputed. Thus, plaintiffs' mere

conjecture that their employer's explanation is a pretext for intentional discrimination is an insufficient

basis for denial of summary judgment." Branson v. Price River Coal Co., 853 F.2d 768,  771-72

(10th Cir. 1988)(citations and internal quotations omitted)(alteration and emphasis in the original).

"[J]ust because the reasoning relied upon for a certain action is mistaken does not mean that the

reason is pretextual." Randle v. City of Aurora, 69 F.3d 441, 455 (10th Cir. 1995).  "The mere fact

that an employer failed to follow its own internal procedures does not necessarily suggest that the

employer was motivated by illegal discriminatory intent or that the substantive reasons given by the

employer for its employment decision were pretextual." Id. at 454 (citation omitted).  The court's

"role is to prevent unlawful hiring practices, not to act as a super personnel department that second

guesses employers' business judgments." Simms v. Okla. ex rel. Dep't of Mental Health & Substance

Abuse Servs., 165 F.3d 1321, 1329 (10th Cir. 1999).  "It is the manager's perception of the

employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative

performance." Furr v. Seagate Tech., 82 F.3d 980, 988 (10th Cir. 1996)(citing Branson v. Price

River Coal Co., 853 F.2d at 772).  The Tenth Circuit has indicated that "pretext is not established by

virtue of the fact that an employee has received some favorable comments in some categories or has,

in the past, received some good evaluations." Perry v. St. Joseph Reg'l Med. Ctr., 110 Fed. Appx.

63, 68 (10th Cir. 2004)(quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 528 (3d

Cir. 1992))(internal quotations omitted).[3]

## 2.    Retaliation

The NMHRA forbids "any person or employer to . . . engage in any form of threats, reprisal or discrimination against any person who has opposed any unlawful discriminatory practice or has filed a complaint, testified or participated in any proceeding under the [New Mexico] Human Rights Act." N.M. Stat. Ann. § 28-1-7(I)(2).  The Supreme Court of New Mexico has explained that these prohibited acts fall under the label of "unlawful retaliation." Juneau v. Intel Corp., 139 N.M. at 12, 127 P.3d at 552.  "To establish a prima facie case of retaliation, [a plaintiff] must show that (1) he engaged in protected activity, (2) he was subject to adverse employment action subsequent to, or contemporaneous with the protected activity, and (3) a causal connection exists between the protected activity and the adverse employment action." Id.

"An adverse employment action occurs when an employer imposes a tangible, significant, harmful change in the conditions of employment." Ulibarri v. State Corr. Acad., 139 N.M. 193, 131 P.3d 43, 2006 N.M. LEXIS 127, at *16 (N.M. 2006)(citing Burlington Indus. v. Ellerth, 524 U.S. 742, 761 (1998)).  In the Tenth Circuit, the adverse employment action "must amount to a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or . . . causing a significant change in benefits." Stover v. Martinez, 382 F.3d 1064, 1071 (10th Cir. 2004)(citations and internal quotations omitted).  "To be an adverse action, the employer's conduct must be 'materially adverse' to the employee's job status." Wells v.

_____

[3] The Tenth Circuit Rule 36.3(B) states: "Citation to an unpublished decision is disfavored. But an unpublished decision may be cited to if: (i) it has persuasive value with respect to a material issue that has not been addressed in a published opinion; and (ii) it would assist the court in its disposition."  This unpublished decision meets both these criteria, and the rules therefore allow citation to this unpublished decision.

Colo. DOT, 325 F.3d 1205, 1213 (10th Cir. 2003)(citation omitted).  Where an employee receives a "satisfactory" evaluation and fails to show that the evaluation was "unfavorable," the performance evaluation is not an adverse employment action.  Cole v. Ruidoso Mun. Sch., 43 F.3d 1373, 1382 (10th Cir. 1994)(describing ruling in Meredith v. Beech Aircraft Corp., 18 F.3d 890 (10th Cir. 1994)).  See Rennard v. Woodworker's Supply, Inc., 101 Fed. Appx. 296, 307 (10th Cir. 2004) ("Similarly, we have held that a satisfactory performance evaluation, although lower than previous evaluations, was not an adverse employment action where the employee presented no evidence of adverse action relating to her evaluation." (citations and internal quotations omitted)).  "Not everything that makes an employee unhappy qualifies as retaliation."  Garrison v. Gambro, Inc., 428 F.3d 933, 939 (10th Cir. 2005).

Regarding the causal connection element, "[a] causal connection may be shown by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.  Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation." O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001)(citations and internal quotations omitted).  The Tenth Circuit has held that a three-month period is not sufficient, by itself, to establish causation.  See id. (citation omitted)

### LAW REGARDING BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

"The general rule in New Mexico is that an employment contract is for an indefinite period and is terminable at the will of either party unless the contract is supported by consideration beyond the performance of duties and payment of wages or there is an express contractual provision stating otherwise."  Hartbarger v. Frank Paxton Co., 115 N.M. 665, 668, 857 P.2d 776, 779 (1993)(citation

omitted). "An at-will employment relationship can be terminated by either party at any time for any reason or no reason, without liability." Id. (citation omitted). One exception to the general rule of at-will employment is "where the facts disclose the existence of an implied employment contract provision that limits the employer's authority to discharge." Trujillo v. Northern Rio Arriba Elec. Coop., 131 N.M. 607, 615, 41 P.3d 333, 341 (2001)(citations and internal quotations omitted). An implied employment contract may be found "in written representations such as an employee handbook, in oral representations, in the conduct of the parties, or in a combination of representations and conduct." Garcia v. Middle Rio Grande Conservancy Dist., 121 N.M. 728, 731, 918 P.2d 7, 10 (1996)(citations and internal quotations omitted). "To create contractual rights, however, the terms of the representation must be sufficiently explicit to create a reasonable expectation of an implied contract." Trujillo v. Northern Rio Arriba Elec. Coop., 131 N.M. at 615-16, 41 P.3d at 341-42. A personnel manual may give rise to an implied employment contract "if it controlled the employer-employee relationship and an employee could reasonably expect his employer to conform to the procedures it outlines." Garcia v. Middle Rio Grande Conservancy Dist., 121 N.M. at 732, 918 P.2d at 11 (citations and internal quotations omitted).

"[T]he implied covenant of good faith and fair dealing requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement." Bourgeous v. Horizon Healthcare Corp., 117 N.M. 434, 438, 872 P.2d 852, 856 (1994)(citation omitted). New Mexico has "refused to recognize a cause of action for breach of an implied covenant of good faith and fair dealing in at-will employment contracts." Melnick v. State Farm Mut. Auto. Ins. Co., 106 N.M. 726, 730, 749 P.2d 1105, 1110 (1988).

-16-

## LAW REGARDING DEFAMATION

In New Mexico, a defamatory statement is one that "has a tendency to render the party about whom it is published contemptible or ridiculous in public estimation, or expose him to public hatred or contempt, or hinder virtuous men from associating with him." Andrews v. Stallings, 119 N.M. 478, 482, 892 P.2d 611, 615 (Ct. App. 1995)(citations and internal quotations omitted).  "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." Id. (quoting Restatement (Second) of Torts § 566)(internal quotations omitted). To determine whether a statement is one of fact or opinion, district courts should consider: "(1) the entirety of the publication; (2) the extent that the truth or falsity of the statement may be determined without resort to speculation; and (3) whether reasonably prudent persons reading the publication would consider the statement to be an expression of opinion or a statement of fact." Mendoza v. Gallup Indep. Co., 107 N.M. 721, 723, 764 P.2d 492, 494 (Ct. App. 1988)(citation omitted).

## ANALYSIS

Because the Court previously remanded Chaara I, only those claims that comprise Chaara II remain for the Court's consideration.  The Court will grant the Defendants' motion for summary judgment on Chaara II's claims, because there is no genuine issue of material fact on Chaara's claims for national origin discrimination, retaliation, breach of contract, breach of the implied covenant of good faith and fair dealing, and defamation.  The Court will dismiss the remainder of the motion as moot, because the Court remanded those claims to the Thirteenth Judicial District of New Mexico.

-17-

# I.   CHAARA HAS NOT SHOWN THAT THE DEFENDANTS' LEGITIMATE NON-DISCRIMINATORY REASONS FOR THE DENIAL OF THE GL POSITION AND HIS PERFORMANCE REVIEW ARE PRETEXT.

Chaara contends that the Defendants discriminated against him, in violation of the NMHRA, because of his national origin when they chose Stone over him for the GL position and when they ranked him in the second, instead of the first, cloud for his performance in 2002, resulting in a denial of a promotion.  See Response at 2, 15-16.  The NMHRA prohibits discrimination on the basis of national origin.  See N.M. Stat. Ann. § 28-1-7(A).  Under the McDonnell Douglas analysis, which the Supreme Court of New Mexico looks to as helpful, the plaintiff bears the initial burden of demonstrating a prima facie case of discrimination, which then shifts the burden to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action.  See Juneau v. Intel Corp., 139 N.M. 12, 127 P.3d at 551.  In this case, the Defendants have assumed that Chaara can meet his prima facie case.  See Memorandum in Support of Summary Judgment at 12, filed August 1, 2005 (Doc. 25).

Regarding Rashap's decision to promote Stone to the GL position to which Chaara had applied, the Defendants' legitimate non-discriminatory reason is that a panel of three GLs and three ICs unanimously recommended her for the position.  See Rashap Aff. ¶ 7, at 2.  Two panelists gave her "strong hire" recommendations.  Id.  Stone also had three and a half years of management experience.  Id.  As for Chaara, four panelists recommended that Chaara not be selected; three panelists gave "strong not hire" recommendations because of Chaara's lack of management skills. Id. ¶ 6, at 2.  Indeed, one panelist stated that Chaara had "no people skills," and another described him as "self-centered," and as a person who believes his "personal opinion outweighs group decisions."  Panel Notes on Mabrouk Chaara at 1.  For a position that transitions Intel employees into

a management career track, see Rashap Aff. ¶ 2, at 1, the emphasis on Stone's management qualifications and Chaara's lack of management skills was legitimate and non-discriminatory as to his national origin.

Because the Defendants have put forth a legitimate non-discriminatory reason, Chaara must present evidence that the Defendants' proffered reason for the employment decision was pretextual -- i.e. unworthy of belief.  See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1230.  Chaara explains that the Defendants' proffered reason is pretextual because Stone "lacked any Etch experience[,] which was the position she was hired for.  It is also undisputed that Chaara had experience directly in Etch and had been directly working with the group prior to applying for the job."  Response at 15.

While it may be true that Chaara had more *technical* expertise than Stone, Chaara does not dispute that Stone's three and a half years of *managerial* expertise made her a more attractive candidate for this position.  Singling out Stone's superior managerial experience was legitimate, because "*[m]anagement* skills and the ability to communicate and work well with others"  were considered to be important qualifications for the position.  Rashap Aff. ¶ 2, at 1 (emphasis added).  Chaara does not explain why his technical expertise trumps Stone's managerial expertise, nor why the Defendants' emphasis on managerial expertise is so unworthy of credence, in light of the managerial nature of the position, that a reasonable factfinder could infer that the Defendants did not hire Stone for this reason.  Consequently, the weight that Chaara puts on his technical expertise fails to dent the legitimate, non-discriminatory reason that the Defendants have put forth.  Furthermore, even if Chaara is correct that his technical experience should count more than Stone's managerial expertise, just because the reasoning relied upon for hiring Stone was mistaken does not mean that

-19-

the reason is pretextual, see Randle v. City of Aurora, 69 F.3d at 455; Chaara does not present any evidence that the Defendants knew that they should give greater weight to Chaara's technical knowledge but failed to do so.  The Tenth Circuit has instructed that district courts should not act as a super personnel department that second guesses employer's personnel decisions.  Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d at 1329.

Turning to the ranking-and-rating session, the Defendants explain that the ranking-and-rating group placed Eaton, and not Chaara, in the first cloud because Eaton had made "a wide impact throughout Intel," was "often sought out for assistance," and mentored other employees.  Fehrman Aff. ¶ 5, at 1-2; Denduluri Aff. ¶ 6, at 1-2.  These reasons are legitimate, because they relate to the quality of Eaton's performance at Intel, and they were non-discriminatory because they were not based on his national origin.

Chaara attacks these reasons as pretextual on three fronts.  First, Chaara asserts that he "had these strengths and from all indications had more technical ability than Eaton."  Response at 16.  Chaara, however, does not cite to any evidence that he also had a wide impact throughout Intel, was often sought out for assistance, and mentored other employees.  See generally id.  While Chaara presents evidence that *he* believes that he had more technical ability than Eaton, see Chaara Aff. ¶ 44, at 8, he has not brought forward evidence that shows that the ranking-and-rating group also believed that he had more technical ability than Eaton and that this difference should have placed Chaara in the first cloud, yet used its reasons for ranking Eaton as pretext to disguise its discriminatory motives.  As the Tenth Circuit has instructed, it is the manager's perception of the employee's performance that is relevant, not the plaintiff's subjective evaluation of his own relative performance.  See Furr v. Seagate Tech., 82 F.3d at 988.

-20-

Secondly, Chaara states that he had been ranked in the top cloud at a prior, mid-year review, and that the Defendants cannot point to any improper behavior or substandard performance to justify a decline to the second cloud.  <u>See</u> Response at 16.  The Tenth Circuit, however, has indicated that pretext is not established by virtue of the fact that an employee has received some favorable comments in some categories or has, in the past, received some good evaluations.  <u>See</u> <u>Perry v. St. Joseph Reg'l Med. Ctr.</u>, 110 Fed. Appx. at 68.

Finally, Chaara asserts that he has never heard of a cloud consisting of a single person before this ranking-and-rating session, and that if another Arab person, Refaat Mankarious, was included in the ranking-and-rating group, then "the line between clouds" would have "ultimately" been affected.  Response at 16.  Chaara does not explain why the fact that he has never heard of a cloud of only one person means that it is so unusual as to undercut the ranking as a pretextual effort to deny him his rightful ranking.  While Chaara believes that the "statistics" and "natural breaks" used in the ranking-and-rating session leave "no question" that Chaara would have been in the top cloud if Mankarious had been included, Chaara does not illuminate what those statistics and natural breaks are.  <u>Id.</u>  Without more elaboration, Chaara's assertion is mere conjecture, based on Chaara's speculation of what might have happened had the facts in his case been different.  <u>See</u> <u>Branson v. Price River Coal Co.</u>, 853 F.2d at  771-72.  Chaara has therefore not shown that the Defendants' legitimate, non-discriminatory reasons were pretext.

## II.   CHAARA HAS NOT PUT FORTH A PRIMA FACIE CASE OF RETALIATION.

On September 5, 2001, Chaara filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  <u>See</u> Chaara Aff. ¶ 4, at 1.  A week later, Chaara filed another charge, alleging retaliation for filing the earlier charge.  <u>See</u> <u>id.</u> ¶ 5, at 1.  Eventually, Chaara decided

-21-

not to file suit on either of these two charges.  See id. ¶ 7, at 2.  Nevertheless, Chaara asserts that the Defendants retaliated against him for filing the two charges by: (i) choosing to promote Stone, rather than Chaara, to the open GL position; (ii) "wrongly changing" his performance review to bolster their decision not to promote him to grade level 8; and (iii) placing him in the second cloud instead of the first cloud.  Response at 18-19.

The NMHRA forbids any person or employer to engage in any form of threats, reprisal or discrimination against any person who has opposed any unlawful discriminatory practice or has filed a complaint, testified or participated in any proceeding under the NMHRA.  See N.M. Stat. Ann. § 28-1-7(I)(2).  To establish a prima facie case of retaliation under the NMHRA, Chaara must show that: (i) he engaged in protected activity; (ii) he was subject to adverse employment action subsequent to, or contemporaneous with the protected activity; and (iii) a causal connection exists between the protected activity and the adverse employment action.  See Juneau v. Intel Corp., 139 N.M. at 12, 127 P.3d at 552.

As the Defendants point out, each of Chaara's alleged acts of retaliation falters on the third element, causal connection.  The Tenth Circuit teaches that a causal connection may be shown by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.  See O'Neal v. Ferguson Constr. Co., 237 F.3d at 1253.  Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, however, Chaara must offer additional evidence to establish causation.  See id.

The alleged acts of retaliation are not close in time to the protected activities because: the selection of Stone occurred in October 2002, thirteen months after Chaara filed his two charges, see Chaara Aff. ¶ 9, at 2; the ranking-and-rating session that assigned Chaara to the second cloud took

place in January 2003, sixteen months after Chaara filed his two charges, see Fehrman Aff. ¶ 3, at 1;
and Wash suggested adding a section to Chaara's performance review after the ranking-and-rating
session, at least sixteen months after Chaara filed his two charges, see id. ¶ 11, at 3.  Because the
Tenth Circuit has expressed that a three-month period between protected activity and retaliation is
not sufficient, by itself, to establish causation, and all of Chaara's alleged acts of retaliation occurred
more than three months after he filed his charges with the EEOC, Chaara must offer additional
evidence to establish causation.[4]

Chaara's entire causation argument, however, consists only of the fact that the alleged acts
of retaliation came after the protected activity and, therefore, must have been motivated by a desire
for revenge for the protected activity.  As Chaara states in his brief, "Defendants do not deny that
Plaintiff engaged in protected activity by filing complaints with the [EEOC] and the Human Rights
Department.  Defendants also do not dispute that[,] following his complaints of discrimination[,]
Chaara applied for and did not receive a group leader position."  Response at 18 (emphasis added).
As the quoted passage makes clear, Chaara's causation argument amounts to a post hoc, ergo
prompter hoc contention that, because the protected activity preceded the alleged acts of retaliation,
a causal link exists between them.  Without additional evidence of a causal connection, Chaara's
prima facie case of retaliation falls short.

Alternatively, the third alleged act of retaliation, ranking Chaara in the second cloud, is not

_____

[4] At the hearing, Chaara's counsel attempted to argue that the period of time between
protected activity and retaliation was not as long as the Defendants maintained, because Chaara stated
in his affidavit that, "shortly after [foregoing filing a lawsuit on the initial two charges in September
2001] and after the time to file suit had run, Defendants started to discriminate and retaliate against
me again."  Chaara Aff. ¶ 7, at 2.  Chaara, however, does not shed light on when these alleged acts
of discrimination and retaliation occurred, or even what those acts were, other than the three alleged
acts of retaliation that he highlighted in his brief.

-23-

an adverse action.  An adverse employment action occurs when an employer imposes a tangible, significant, harmful change in the conditions of employment.  See Ulibarri v. State Corr. Acad., 131 P.3d 43, 2006 N.M. LEXIS 127, at *16.  In the Tenth Circuit, the adverse employment action "must amount to a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or . . . causing a significant change in benefits."  Stover v. Martinez, 382 F.3d at 1071.  As an initial matter, there is no evidence that planting Chaara in the second cloud produced a harmful change, or any change at all, in the conditions of his employment.  Instead, the ranking and rating merely determined how Chaara was faring compared to his co-workers without being materially adverse to his continued employment. See Wells v. Colo. DOT, 325 F.3d at 1213.  The Defendants' Open Door Policy supports this impression, because it states that, "[t]ypically, Intel does not conduct Open Door investigations into ranking as the employee's rank position, in and of itself, does not have any direct impact on the employee."  Focal 2003 Open Door Process at 2.

If Chaara means to say that the evaluation was retaliation because it was lower than prior evaluations, the Tenth Circuit has foreclosed this argument.  Where an employee receives a "satisfactory" evaluation and fails to show that the evaluation was "unfavorable," the performance evaluation is not an adverse employment action.  Cole v. Ruidoso Mun. Sch., 43 F.3d at 1382.  Here, the ranking-and-rating group ranked Chaara second overall and at the top of the second cloud.  See Fehrman Aff. ¶ 6, at 2.  As such, the ranking-and-rating session was positive toward Chaara, and Chaara has not explained how the ranking and rating evaluated him in a negative light.  Furthermore, the Tenth Circuit has indicated that a satisfactory performance evaluation, although lower than previous evaluations, is not an adverse employment action where the employee presents no evidence

of adverse action relating to her evaluation.  See Rennard v. Woodworker's Supply, Inc., 101 Fed.

Appx. at 307.  Again, the ranking-and-rating session favorably evaluated Chaara and, even if it was

lower than prior evaluations, Chaara has not presented evidence of adverse action related to the

ranking-and-rating session; in fact, Chaara subsequently received B and C levels of Intel stock.  See

Baglee Aff. ¶ 6, at 1.  Chaara's unhappiness with being put in the second cloud, without more, does

not add up to retaliation.  See Garrison v. Gambro, Inc., 428 F.3d at 939.

## III.   THERE IS NO GENUINE ISSUE ON CHAARA'S BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIMS.

Chaara alleges that the Defendants modified his at-will employment status by creating an

implied employment contract, and that the Defendants subsequently breached that agreement.  See

Response at 19-20.  The general rule in New Mexico is that an employment contract is for an

indefinite period and is terminable at the will of either party unless the contract is supported by

consideration beyond the performance of duties and payment of wages or there is an express

contractual provision stating otherwise.  See Hartbarger v. Frank Paxton Co., 115 N.M. at 668, 857

P.2d at 779.  One exception to the general rule of at-will employment is where the facts disclose the

existence of an implied employment contract provision that limits the employer's authority to

discharge.  See Trujillo v. Northern Rio Arriba Elec. Coop., 131 N.M. at 615, 41 P.3d at 341.  To

create contractual rights, however, the terms of the representation must be sufficiently explicit to

create a reasonable expectation of an implied contract.  See id. at 615-16, 41 P.3d at 341-42.

Chaara makes three allegations regarding implied employment contracts that the Defendants

allegedly made with him.  First, Chaara alleges that the Open Door Process, which Intel made

available to its employees for investigating alleged violations of the law, created an implied contract

with him that bound Intel to follow that process.  See Response at 19-20.  The terms of the Open

Door policy, however, were not sufficiently explicit to create a reasonable expectation in Chaara of

an implied contract.  The opening section of the policy states: "This *reference document explains*

Intel's approach to handling Open Doors related to Focal.  It contains a summary of roles and

responsibilities.  It also identifies the most common issues raised by employees and *outlines an*

*approach* to thoroughly investigating those issues." Focal 2003 Open Door Process at 1 (emphases

added).  The document's description of itself indicates that it is a reference sheet that provides one

possible way to proceed in the face of an accusation of improper activities, without intending to bind

Intel to the details of the policy in every situation.  Furthermore, the document directs itself explicitly

to those conducting the Open Door Process, not to individual employees: "This *reference document*

is for *Business Group Human Resources* (BGHR) and *operations managers* who will be conducting

Open Doors." Id. (emphases added).  Because the document expresses itself as a reference for use

by Open Door investigators rather than intimating a promise to employees about how Open Doors

will be conducted, it is non-promissory in nature and merely a declaration of Intel's general approach

to Open Door investigations.  See Sanchez v. The New Mexican, 106 N.M. 76, 79, 738 P.2d 1321,

1324 (1987)("In our opinion, the evidence supports the Employer's contention that the handbook

lacked specific contractual terms which might evidence the intent to form a contract. The language

is of a non-promissory nature and merely a declaration of defendant's general approach to the subject

matter discussed.").

　　　　Second, Chaara contends that Intel's anti-discrimination policies constituted an implied

contract with him, which the Defendants allegedly broke by discriminating against him.  The New

Mexico Court of Appeals and the Tenth Circuit, however, have both held that general non-

discriminatory policies are vague assurances that are too indefinite to form a contract.  See Stieber v. Journal Publ. Co., 120 N.M. 270, 274, 901 P.2d 201, 205 (Ct. App. 1995)(finding that a statement in a handbook that declared that the defendant was an equal opportunity employer to be a "declaration of [d]efendant's general approach to the subject matter discussed" and "insufficient to form the basis for a suit for breach of contract" (citations and internal quotations omitted)); Vasey v. Martin Marietta Corp., 29 F.3d 1460, 1465 (10th Cir. 1994)(concluding that a company's general commitment to equal opportunity and affirmative action are "merely 'vague assurances,' and too indefinite to constitute a contractual offer which would enable a court to determine whether a contract has been performed" (citations omitted)).

Finally, Chaara asserts that Intel violated "certain policies, procedure[s] and practices for evaluating employees" when the Defendants "added negative information in his evaluation," "failed to properly rank Chaara," and excluded an Arab employee from the ranking-and-rating process. Response at 20.  Chaara, however, fails to identify the source or substance of those policies, procedures, and practices.[5]  See generally id.  Chaara's failure to specify the terms of the alleged implied contract, or from where those terms emanate, means that he has not raised a genuine issue on this point.  The Defendants have therefore demonstrated that there is no genuine issue that they did not make an implied employment contract with Chaara.

The absence of a genuine issue on Chaara's breach of contract claim has consequences for

---

[5] In his Response to the Defendants' Statement of Undisputed Material Facts, Chaara at times seems to indicate that the "bragsheet template" serves as a source of the alleged policies, procedures, and practices. Response at 8-11.  If so, the Court notes that the bragsheet template that Chaara provides states that it is for the review period of January 1, 2000-December 31, 2000; the review period forming the basis of Chaara's breach of contract claim, however, was January 1, 2002-December 31, 2002.  See Performance Review/Bragsheet Template 1; Chaara Aff. ¶ 26, at 5.  The bragsheet template, therefore, sheds little light, if any, on Chaara's breach of contract claim.

his breach of the implied covenant of good faith and fair dealing claim.  New Mexico has refused to recognize a cause of action for breach of the implied covenant of good faith and fair dealing in at-will employment contracts.  See Melnick v. State Farm Mut. Auto. Ins. Co., 106 N.M. at 730, 749 P.2d at 1110.  Because the Court concludes that there is no genuine issue that Chaara's employment relationship with Chaara was at-will and that Intel did not enter into an implied contract with Chaara that modified his at-will status, Chaara's breach of the implied covenant of good faith and fair dealing claim must also go by the wayside.

## IV.    THE STATEMENT ADDED TO CHAARA'S EVALUATION WAS AN OPINION.

Chaara asserts that the statement added to the Performance Review concerning his communication skills was defamatory.  Response at 20-21.  The Defendants maintain that there is no genuine issue that the statement is opinion, which New Mexico courts have stated does not give rise to a suit for defamation.

In New Mexico, a defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.  See Andrews v. Stallings, 119 N.M. at 482, 892 P.2d at 615.  To determine whether a statement is one of fact or opinion, district courts should consider: (i) the entirety of the publication; (ii) the extent that the truth or falsity of the statement may be determined without resort to speculation; and (iii) whether reasonably prudent persons reading the publication would consider the statement to be an expression of opinion or a statement of fact.  See Mendoza v. Gallup Indep. Co., 107 N.M. at 723, 764 P.2d at 494.

In this case, the following is the allegedly defamatory statement:

Mabrouk should continue to enhance his communication effectiveness.  Mabrouk needs to be able to modify his communication style based on the situation. . . .  His

-28-

> presentations need to be tailored to the audience level, expected outcome, and time constraint. Polishing his skills in communication will engage the audience while they are listening and make them receptive about his recommendations.

Performance Review at 2. Using the factors outlined in Mendoza v. Gallup Indep. Co. as a guide, the entirety of the Performance Review reflects a recitation of Chaara's current position and key accomplishments, followed by a subjective appraisal of Chaara's abilities and performance. See id. The section in which the quoted language appears is the subjective aspect of the Performance Review, evaluating Chaara's strengths and weaknesses.

Examining the second factor, the extent that the truth or falsity of the statement may be determined without resort to speculation, the Court cannot discern a statement of fact within this passage. Instead, it appears to be an entirely subjective judgment about Chaara's communication skills, incapable of being proved or disproved by an objective test. By what measure could a disinterested observer test whether Chaara's presentations need to be tailored, to a greater extent than now, to the audience level, expected outcome, and time constraint? How could one conclusively determine that polishing Chaara's communication skills, beyond their current level, will engage the audience while they are listening and make them receptive about his recommendations? The inserted language is less like an immutable law of physics, susceptible to confirmation in a lab, and more like the viewpoint of a particular person that may change depending on the eye of the beholder.

For the same reasons, a reasonably prudent person reading the excerpt would consider it to be an expression of opinion, not a statement of fact. On its face, the quotation is an exhortation by the author to improve in certain areas in which the writer believes that Chaara needs more effort. It puts on paper the author's opinion of Chaara's communication abilities, not any factual assertions about his skills.

-29-

Chaara's only riposte to this reasoning is that the statement was "clearly inserted to affect Chaara's ability to advance within the company."  Response at 20.  Chaara cites no cases for his proposition that opinions can only be based on angelic motives, nor is the Court aware of any such authority.  Even so, Chaara cites to no evidence establishing that the Defendants added the material for the purpose that he alleges.  See generally Response at 20-21.  Because the Defendants have shouldered their burden of showing an absence of evidence on Chaara's claims for national origin discrimination, retaliation, breach of contract, breach of the implied covenant of good faith and fair dealing, and defamation, and Chaara has not returned with specific facts that show the existence of a genuine issue of material fact on those claims, the Court will grant the Defendants' motion for summary judgment on those claims.  The Court will dismiss the remainder of the motion as moot, because the Court remanded those claims to the Thirteenth Judicial District of New Mexico.

**IT IS ORDERED** that the Defendants' Motion for Summary Judgment is granted in part. The Court grants the motion as to Chaara's claims for national origin discrimination, retaliation, breach of contract, breach of the implied covenant of good faith and fair dealing, and defamation. The Court dismisses the remainder of the motion as moot.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Laura J. Ramos
David G. Crum & Associates, P.C.
Albuquerque, New Mexico

     *Attorney for the Plaintiff*

Quentin Smith
Barbara G. Stephenson
Gilkey & Stephenson, P.A.
Albuquerque, New Mexico

     *Attorneys for the Defendants*